UNITED STATES of America, Appellee,

v.

Karen Diane SELLERS, Appellant.

UNITED STATES of America, Appellee,

v.

Norman MATTOCKS, Appellant.

Nos. 81–5052, 81–5072.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 8, 1981.

Decided Dec. 24, 1981.

Willie A. Swann, Fayetteville, N. C.
(Swann, Compton & Pearson, P. A., Fa-
yetteville, N. C., on brief), for appellant
Norman Mattocks.

H. Julian Philpott, Jr., Raleigh, N. C.
(Broughton, Wilkins & Crampton, Raleigh,
N. C., on brief), for appellant Karen Diane
Sellers.

James L. Blackburn, U. S. Atty., Raleigh, N. C. (Suzanne L. Jowdy, Asst. U. S. Atty., on brief), for appellee.

Before BUTZNER, RUSSELL and WIDENER, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

Karen Diane Sellers and Norman Mattocks appeal their convictions for the armed robbery of the Waccamaw Bank and Trust Company of Whiteville, North Carolina, on August 24, 1979. We affirm.

The defendant Sellers, a white female, and the defendant Mattocks, a black male, had been dating for several months prior to the robbery, the commission of which was the subject of their prosecution. On the day of the robbery, Mattocks, a patrolman with the Whiteville Police Department, was delegated to provide protection to a Waccamaw Bank teller as she drove to the various Whiteville branches distributing money to such branches. At a point on the trip an armed individual jumped into the back seat of the car. An individual, meeting the appearance of the one who jumped into the car, had been observed by several persons walking nervously back and forth at the street corner where the bank robber had been when he or she later jumped into the patrol car. This individual had been seen using, as he or she paced back and forth, a walkie-talkie radio. The individual from time to time would put this radio to his or her ear prior to the time the patrol car came by. The individual wore a toboggan, a flannel shirt and green fatigue pants, an unusual attire for that time of year (August) in eastern North Carolina. The observers identified the individual as a woman because they saw the outline of a bust under the flannel shirt. The individual's complexion was described as "Indian, or a highly tanned Caucasian person."

After entering the car this individual brandished a gun and, using a tape-recorded male voice, ordered Mattocks to drive to a secluded location. The use of a taped recording of a male voice was, under the Government's theory of the case, to conceal the fact that the robber was a woman. After blindfolding and tying Mattocks and the teller, the individual absconded with $43,080 in bank funds. An hour or so later, the defendant Sellers was observed with "fleshy" or "red-like" face and hands and wearing clothes corresponding generally to those of the person who jumped into the police car. She, also, was seen to have a gun in the back seat of her car.

Sellers and Mattocks suddenly left Whiteville about two weeks after the robbery. While he had been living in Whiteville, Mattocks had been occupying a house rented from Ms. Lillian Ross. Ms. Ross lived in Bristol, Pennsylvania, but her daughter, Cheryl Floyd, lived in Whiteville, and had charge of her mother's property in Whiteville. Mattocks was five months behind in his rent at the time he left. He gave Ms. Ross no notice of his departure but he did leave a letter for her, telling her that because of circumstances, he would be leaving and that he had some valuable things there that he had bought that she could have. He asked Ms. Floyd not to tell anyone he had gone. About a week after Mattocks disappeared, the local police officers inquired of Ms. Floyd whether they could search the house. Ms. Floyd consented and unlocked the house for the search. As a result of the search the officers seized several face sketches, including at least one on which brown-orange paint had been smeared, a newspaper clipping of a disguised face, and a white foam mannequin's head colored brown-orange. These items were later admitted at trial over objection as Government Exhibits 27 and 28.[1]

On October 9, 1979, the two defendants were indicted but the defendants disappeared and traveled across the continent under false names, until they were discovered almost a year later on September 3, 1980, at Bakersfield, California. At the time of their arrest, Sellers and Mattocks agreed to a search of the apartment they were sharing on the condition that Sellers be present. Pursuant to this authorization, the federal officers, with the defendant Sellers present,

---

1. It was the Government's position that these various drawings, clippings and the stained mannequin were all made by Mattocks in preparation for the robbery and for the purpose of disguising the actual robber.

made a cursory search of the apartment, seeking particularly a gun. They found no gun and quickly discontinued the search.

Mattocks, after his arrest, turned over to his friend, an apartment neighbor, Edwards, the key to his car (which had been purchased after the robbery) as well as the keys to the apartment he and Sellers had been sharing, with the request that he (Edwards) take his possessions to his (Edwards') apartment and keep them for him. Sellers, however, told a friend of hers, Debbie Brown, at about the same time, to take care of her goods in the apartment. Later, though, Edwards saw her at prison and told her he had, under Mattocks' direction, taken possession of both Mattocks' and her effects. She said she did not know that Mattocks had done this but requested Edwards to keep her effects for her. In October, 1980, the officers requested Edwards' consent to a search of the effects of the defendants which were being kept by Edwards. Edwards readily consented. A number of receipts and other papers seized pursuant to that search later became Government Exhibits 37 through 52 and 55 through 59. These records consisted of motel bills, airplane ticket receipts, etc., showing that the defendants were traveling together.

After their arrest in Bakersfield, the defendants were returned to North Carolina for trial. Prior to trial, however, the defendants made a number of motions, all of which were denied by the district judge. After all motions had been denied by the district judge, the cause proceeded to trial and resulted in the conviction of both defendants. The defendants have now appealed. The defendants appeal the denial of their motions for separate trials, and Mattocks appeals the denial of his motion to suppress the fruits of the search of his house in Whiteville; both Sellers and Mattocks challenge the validity of the search of their effects at the Edwards' apartment in Bakersfield.

■ We turn, first, to the appeal by the defendants from the denial of their motions for a separate trial. The basis of these

motions was the claim that the evidence of the interracial relationship of the parties would be prejudicial to them in the eyes of the jury, if they were tried jointly. The difficulty with this argument is that the relationship between the two defendants was an integral part of both the prosecution's and the defendants' contentions. Unless he dismissed the prosecution outright, the district judge could not prevent proof of the relationship between Mattocks and Sellers from becoming a part of the record, whether there was a joint trial or separate trials. Their relationship would thus inescapably have been developed in the record. The only action the district judge could take in the situation to preclude prejudice from evidence which could not be excluded from the record was a searching voir dire examination of the jurors. That he did. Under the circumstances of this case, we are unable to find any unreasonable prejudice to the defendants in a joint trial or any error in the district judge's denial of a severance. *See United States v. Frazier*, 394 F.2d 258, 260 (4th Cir. 1968), *cert. denied*, 393 U.S. 984, 89 S.Ct. 457, 21 L.Ed.2d 445.

■ The other motions related to the search (a) at the house occupied by Mattocks in Whiteville before he left that town and (b) of the effects of Mattocks and Sellers at the home of Michael Edwards in Bakersfield, California. The Whiteville search occurred about a week after Mattocks had departed from Whiteville. As we have already observed, at the time he was five months delinquent with his rental payments. While he did not speak with Ms. Ross or her daughter, Ms. Floyd, he did leave a note for Ms. Ross in the house when he departed. In this letter he told her he was sorry he could not pay his rent but he told her he was leaving everything in the house and that she could have them.[2] The district judge found on this evidence that Mattocks had "either abandoned the property or lost any right to object to an entry to the premises by the landlord," and, therefore, had no standing to challenge the search. This finding was clearly justified

---

2. In his brief, Mattocks' counsel summarizes this note of Mattocks as "saying, in essence, that he would not return." This language is tantamount to a concession of abandonment.

under the record. *United States v. Annese,* 631 F.2d 1041, 1043 (1st Cir. 1980); *United States v. Parizo,* 514 F.2d 52, 55 (2d Cir. 1975).

The validity of the search in Bakersfield turns on the authority of Edwards to consent to the search of the properties of Mattocks and Sellers in Edwards' home. Valid third-party consent to a search may be given by one who "shares with the absent target of the search a common authority over, general access to, or mutual use of the place or object sought to be inspected under circumstances that make it reasonable to believe that the third person has the right to permit the inspection in his own right and that the absent target has assumed the risk that the third person may grant this permission to others." *United States v. Block,* 590 F.2d 535, 539–40 (4th Cir. 1978); *United States v. Buettner-Janusch,* 646 F.2d 759, 765 (2d Cir. 1981) (U.S. appeal pending). Moreover, whenever one "knowingly exposes his activities [or effects] to third parties, he surrenders Fourth Amendment protections" in favor of such activities or effects. *Reporters' Com. v. American Telephone & Telegraph,* 593 F.2d 1030, 1043 (D.C.Cir.), *cert. denied* 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979); to the same effect, *see United States v. Miller,* 425 U.S. 435, 443, 96 S.Ct. 1619, 1624, 48 L.Ed.2d 71 (1976); *United States v. Carter,* 569 F.2d 801, 803 (4th Cir.), *cert. denied,* 435 U.S. 973, 98 S.Ct. 1618, 56 L.Ed.2d 66 (1978); *United States v. Walker,* 575 F.2d 209, 212 (9th Cir. 1978), *cert. denied* 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 325.

There can be no question that the defendants had given no indication of any expectation of privacy in their effects in the apartment. Both had voluntarily consented earlier at the time of their arrest to a search of their apartment and the effects therein. This was known by Edwards. The defendants certainly gave free access to all their effects in their apartment to Edwards and his wife when they authorized them a day or two after their arrest to remove their effects from the apartment and store them at their [the Edwards'] apartment. They manifested no purpose to deny to Ed-

wards or his wife the right to inspect those effects. Under these facts, the defendants surrendered any claim to Fourth Amendment protection against an authorization to search voluntarily given by Edwards.

This case presents a quite different situation from that addressed by this Court in *United States v. Presler,* 610 F.2d 1206 (4th Cir. 1979). In *Presler,* the defendant had entrusted to the third party two briefcases, which are ordinarily depositories of personal papers. Those briefcases were locked and the keys to them were retained by the defendant. The defendant did not knowingly expose the contents of those briefcases to the third party; in fact, he took every precaution to protect the contents of the briefcases from the third party. The defendants did nothing like that here. Everything in the apartment was openly exposed with nothing locked but all available for view and transfer by the Edwards. We agree with the district judge that Edwards' authorization to search the defendants' effects as taken from their apartment in Bakersfield and stored in his (Edwards') apartment, was valid.

The judgments of conviction of both the defendant Mattocks and the defendant Sellers are accordingly

AFFIRMED.